# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA

| | |
|---|---|
| DANIELLE MITTEREDER ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No._____ |
| ) | |
| KRISTI NOEM, Secretary of Homeland Security ) | **JURY DEMANDED** |
| U.S. DEPARTMENT OF HOMELAND ) | |
| SECURITY ) | |
| 2707 Martin Luther King Jr. Ave. SE ) | |
| Washington, DC 20528 ) | |
| ) | |
| Defendant. ) | |

## COMPLAINT

Plaintiff brings this action against Defendant U.S. Department of Homeland Security for violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*. For her Complaint, she states as follows:

1.  Plaintiff Danielle Mittereder started her employment as a Transportation Security Officer ("TSO") for the Transportation Security Administration ("TSA") in June 2024, where she quickly established herself as an exemplary employee, consistently displaying her high-quality work, excellent interpersonal skills, and dedication to ensuring passenger safety. Plaintiff is a transgender woman who has identified and presented as a woman throughout her employment with TSA. On January 20, 2025, President Donald Trump issued Executive Order ("EO") 14168, *Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*, therein formally announcing his Administration's attack on transgender employees within the federal workforce, including Plaintiff. On or around February 7, 2025, in accordance with EO 14168, high-level TSA officials issued a directive prohibiting Plaintiff and all

other transgender TSOs from conducting security pat-downs of airline passengers and disallowing their use of TSA-controlled restrooms that align with their gender identity. Solely because she is transgender, TSA now prohibits Plaintiff from conducting core functions of her job, impedes her advancement to higher-level positions and specialized certifications, excludes her from TSA-controlled facilities, and subjects her identity to unwanted and undue scrutiny each workday.

2.      By these actions, Defendant has discriminated and continues to discriminate against Plaintiff on the basis of sex, in violation of Title VII of the Civil Rights Act of 1964.

## PARTIES

3.      Plaintiff Danielle Mittereder is an adult resident of the State of Virginia.

4.      Defendant Kristi Noem is the current Secretary of Homeland Security for the U.S. Department of Homeland Security. Secretary Noem is named in her official capacity.

## JURISDICTION

5.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this action arises under the laws of the United States, specifically Title VII of the Civil Rights Act of 1964, 42 U.S.C § 2000e, as amended.

6.      Plaintiff's claims for declaratory and injunctive relief are sought consistent with 5 U.S.C. §§ 705 and 706, and as authorized in 28 U.S.C. §§ 2201 and 2202.

7.      Venue properly lies in this Court pursuant to 28 U.S.C. § 1391(b) and (c) because the acts or omissions giving rise to these claims occurred primarily in Virginia and Defendant, specifically the Transportation Security Administration ("TSA" or "Agency"), is located and transacts business at Dulles International Airport in Dulles, Virginia, and is headquartered in Springfield, Virginia. TSA is a part of the Department of Homeland Security ("DHS"). TSA is an agent of Defendant DHS.

8.     On February 7, 2025, Plaintiff timely contacted an EEO counselor to initiate an informal complaint of discrimination concerning a February 7, 2025, TSA directive that prohibited her from performing certain job functions and using TSA restroom facilities that align with her gender identity. Fewer than 45 days elapsed between the issuance of the directive on February 7, 2025, and her initiation of informal EEO counseling that same day.

9.     Plaintiff filed a formal EEO complaint of discrimination with the Agency on March 13, 2025. The Agency notified her of the claims accepted on March 27, 2025, and issued a corrected Notice of Acceptance on April 3, 2025. The Agency issued its Report of Investigation ("ROI") on July 25, 2025. More than 180 days have elapsed from the time of Plaintiff's formal complaint and the initiation of this action in this Court. The Agency has not issued a decision on Plaintiff's formal EEO complaint of discrimination, and no appeal has been filed.

10.     Plaintiff exhausted administrative remedies prior to initiating action in this Court.

### FACTS GIVING RISE TO RELIEF

11.     Plaintiff is a transgender woman, *i.e.*, she is a woman who was assigned the sex of male at birth.[1]

12.     In the summer of 2023, Plaintiff applied for employment as a Transportation Security Officer ("TSO") with TSA. The "Duties" section of the job announcement outlined the principal job duties of the TSO position, including:

---

[1] Transgender individuals have gender identities that do not align with the sex assigned to them at birth. "Gender refers to the characteristics of women, men, girls and boys that are socially constructed[,]" *Gender and health*, World Health Organization, https://www.who.int/health-topics/gender#tab=tab_1 (last accessed Aug. 12, 2025), while sex designations are based on anatomical and physiological traits such as genitalia, gonads, chromosomes, and hormones. National Academies of Sciences, Engineering, and Medicine, Introduction and Background, in Measuring Sex, Gender Identity, and Sexual Orientation 17, 20 (Nancy Bates, Marshall Chin, & Tara Becker eds., 2022).

- Operating various screening equipment and technology to identify dangerous objects in baggage, cargo, and on passengers, and preventing those objects from being transported onto aircraft.

- Performing searches and screening, which may include physical interaction with passengers (e.g., pat-downs, search of property, etc.), conducting bag searches and lifting/carrying bags, bins, and property weighing up to 50lbs.

- Controlling terminal entry and exit points.

13.     As part of Plaintiff's application for employment with TSA, she submitted all her medical records, including her diagnosis of Gender Dysphoria, to Acuity International, the company responsible for performing the medical qualification screenings for all potential new TSA employees.

14.     TSA hired Plaintiff as a Series 1802, D Band TSO at Dulles International Airport. Her official start date was June 30, 2024, and her first day of work was July 1, 2024.

15.     On or around July 1, 2024, Plaintiff met with Amber Sullivan, Deputy Assistant Federal Security Director-Screening, and Melissa Bovello, Administrative Officer, to discuss her job application. Ms. Bovello asked why Plaintiff selected "Yes" for the question "Were you born a male after 1959?" (in order to check military draft eligibility), when she also selected "Female" for the question "Are you male or female?". At that time, Plaintiff disclosed to Ms. Bovello and Ms. Sullivan that she is transgender.

16.     Throughout Plaintiff's employment at TSA, she has identified and presented as a woman.

17.     Plaintiff proceeded through training with the designation as a female TSO.

18.     Plaintiff's core duties and responsibilities as a TSO, as published in TSA's TSO Job Analysis Tool, include "mitigat[ing] threat activities to protect aviation and other transportation modes" through "passenger screening, baggage screening, and Behavior Detection."

"Passenger screening" includes "performing physical and information-based screening of people" – otherwise known as pat-downs – "to identify individuals who may pose a threat as well as detecting objects which may pose a threat to transportation security."

19.    During each work shift, TSOs are assigned to rotate through "Positions" approximately every thirty minutes. The Positions include: Travel Document Checker; Divesting Officer; X-Ray Operator; Property Search Officer; Passenger Screening Officer (using either the Magnetometer or Advanced Imaging Technology); and Floor Officer.

20.    TSOs conduct pat-downs when assigned to the Passenger Screening Officer Position. TSOs staffing the Passenger Screening Officer Position operate screening equipment, including body scanners, "walk through" metal detectors, and handheld metal detectors. Under certain circumstances, Passenger Screening Officers must conduct pat-downs of airline passengers proceeding through the screening equipment in order to clear them to go through the checkpoint.

21.    TSOs conduct pat-downs when assigned to the Floor Officer Position. Any time the passenger is unable to use the screening equipment due to a medical condition or voluntarily opts out of using the screening equipment, the Floor Officer of the same gender must conduct a full-body pat-down of the passenger in order to clear them to go through the checkpoint.

22.    As part of Plaintiff's TSO training, she was partnered with a Coaching Officer of the same gender who provided her with on-the-job training for the core duties and responsibilities of a TSO.

23.    During the second phase of her training, Plaintiff's Coaching Officer was tasked with training her on how to conduct pat-downs. In order to pass the second phase of training, TSA required Plaintiff to complete dozens of standard, partial, and wheelchair pat-downs.

24.    Prior to February 7, 2025, all Checkpoint Certified TSOs assigned to the Passenger Screening Officer Position conducted pat-downs.

25.    Prior to February 7, 2025, all Checkpoint Certified TSOs assigned to the Floor Officer Position conducted pat-downs.

26.    Pat-downs are a core job duty and responsibility of TSOs.

27.    Plaintiff was trained to conduct pat-downs of female passengers, consistent with her gender identity.

28.    Prior to February 7, 2025, passenger screening by transgender TSOs was governed by *Management Directive No. 900.3, Transitioning and Transgender Officers* ("MD 900.3").

29.    MD 900.3 established TSA's commitment "to creating and maintaining an environment that promotes equal employment opportunity for all persons" and ensuring that "transgender . . . Officers . . . are protected from discrimination." Under MD 900.3, "Officers [were] assigned work – including pat-downs in a manner consistent with their gender identity" and were "allowed access to restrooms and (on the same basis as available to others) locker room facilities consistent with the Officer's gender identity."

30.    MD 900.3 reflected established legal protections that require equitable treatment of transgender employees within the workplace. For well over a decade, the Equal Employment Opportunity Commission ("EEOC") has interpreted Title VII to encompass protections against discrimination based on gender identity. In 2012, in *Macy v. Department of Justice*, the EEOC held that discrimination based on an employee's transgender identity is sex discrimination in violation of Title VII. *See* EEOC Appeal No. 0120120821, 2012 WL 1435995 (Apr. 20, 2012). The EEOC reaffirmed this holding in 2015 and further held that an employer's decision to restrict the restroom use of its transgender employees amounted to discrimination in the terms and

conditions of employment. *Lusardi v. McHugh*, 2015 EEOPUB LEXIS 896, *27 (U.S. Equal Employment Opportunity Commission April 1, 2015). In 2020, the Supreme Court also reaffirmed Title VII's protections against employment discrimination for transgender workers in *Bostock v. Clayton Cnty.*, 590 U.S. 644 (2020), emphasizing that "discrimination based on . . . transgender status necessarily entails discrimination based on sex." *Id.* at 669.

31.    Plaintiff successfully completed her TSO training in or around October 2024 and began performing her TSO job duties independently.

32.    Between October 2024 and February 7, 2025, Plaintiff performed pat-downs of female passengers.

33.    During each of her shifts, Plaintiff performed several dozen targeted area, or "partial" pat-downs, in addition to full-body passenger pat-downs. On occasions that she was staffed in an area that had only a stationary walk-through metal detector, she performed as many as twelve (12) full-body pat-downs per shift.

34.    Plaintiff performed her job duties, including passenger pat-downs, in an effective and competent manner.

35.    Plaintiff has received no complaints related to her job performance, including performance of her passenger pat-down responsibilities.

36.    Throughout her employment with TSA, Plaintiff's supervisors have rated her with the highest available performance rating ("Meet Standards") for all competencies and have praised her professionalism, skills, knowledge, and rapport with fellow officers and the public.

37.    In December 2024, Plaintiff received a bonus in recognition of her status as an officer in good standing.

38.     On January 20, 2025, President Trump issued EO 14168, *Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*. The EO defined "sex" as an "immutable biological classification as either male or female" which "does not include the concept of 'gender identity.'" The EO limits the definition of "Female" to "person[s] belonging, at conception, to the sex that produces the large reproductive cell."

39.     EO 14168 denies the existence of transgender individuals and gender identities that differ from a person's sex assigned at birth. For example, the EO purports that the concept of what it calls "gender ideology," or the "ever-shifting concept of self-assessed gender identity" is illegitimate and rests on "the false claim that males can identify as and thus become women and vice versa." The EO states that it is the "policy of the United States to recognize two sexes, male and female," which "are not changeable and are grounded in fundamental and incontrovertible reality."

40.     Transgender people "do exist and have as long as human history has been recorded." *Washington v. Trump*, 768 F. Supp. 3d 1239, 1277 (W.D. Wash. 2025) (cleaned up).

41.     EO 14168 reflects the Trump Administration's assertion that the gender identity and expression of transgender individuals are unworthy of recognition by the federal government.

42.     EO 14168 reflects the Trump Administration's assertion that transgender individuals are not entitled to federal legal protections against discrimination based on sex.

43.     EO 14168 reflects animus toward transgender individuals.

44.     EO 14168 mandated that Agencies "remove all statements, policies, regulations, forms, communications, or other internal and external messages that promote or otherwise inculcate gender ideology, and shall cease issuing such statements, policies, regulations, forms, communications or other messages." The EO also ordered all Agencies to "effectuate this policy

by taking appropriate action to ensure that intimate spaces designated for women, girls, or females (or for men, boys, or males) are designated by sex and not identity."

45.     The Trump Administration issued EO 14168 alongside a number of other Executive Orders that rescinded or purported to rescind legal protections for transgender individuals, restricted freedoms, opportunities, and healthcare for transgender Americans and families, and expressed discriminatory animus toward transgender people, including: EO 14148, rescinding several Biden Administration EOs that provided protections for transgender people; EO 14183, banning transgender people from serving in the military; EO 14187, directing the defunding of institutions that provide gender-affirming medical care to transgender individuals under the age of nineteen; and EO 14190 eliminating funding for schools that "directly or indirectly support" the "instruction, advancement, or promotion" of so-called "gender ideology" in their curricula for students or instructors.

46.     In issuing EO 14168, the Trump Administration intended to revoke established legal protections for transgender people.

47.     The Trump Administration targeted transgender individuals for failing to conform to the stereotypes of "female" or "male" described in the definitions of EO 14168.

48.     During her shift on February 7, 2025, Ms. Sullivan and Ms. Bovello called Plaintiff in for a meeting. Ms. Sullivan stated that she had not summoned Plaintiff concerning any issues with her work performance. She then proceeded to read a directive issued by Mike Turner, Acting Assistant Administrator of TSA's Domestic Aviation Operations, prohibiting all transgender TSOs from conducting pat-downs (the "February 7 Directive").

49.     Ms. Sullivan told Plaintiff that Mr. Turner and other high-level officials issued the February 7 Directive in accordance with EO 14168.

50.     Ms. Sullivan told Plaintiff that she was affected by the February 7 Directive because she is a transgender TSO.

51.     Ms. Sullivan provided no reasons why TSA was prohibiting Plaintiff from conducting pat-downs other than the fact that she is transgender.

52.     Upon information and belief, TSA leadership provided Ms. Sullivan with a document titled "Leadership Talking Points: Pat-downs Conducted by Transgender Employees" ("Talking Points") to guide her conversation with Plaintiff. The document was issued "[t]o ensure consistent messaging across airport field leadership regarding transgender employees no longer performing pat-downs."

53.     The Talking Points stated that "[t]o comply with the [EO] 14168" all transgender officers were prohibited from "perform[ing] pat-downs on travelers."

54.     In accordance with the February 7 Directive, TSA prohibited Plaintiff from performing pat-downs from that day forward.

55.     In accordance with the February 7 Directive, TSA prohibits all known transgender TSOs from performing pat-downs.

56.     The February 7 Directive does not prohibit any non-transgender TSOs from performing pat-downs.

57.     The only criteria used by TSA to determine whether or not a TSO is prohibited from performing pat-downs in accordance with the February 7 Directive is whether or not the TSO is transgender.

58.     By prohibiting Plaintiff from conducting pat-downs because she is transgender, TSA discriminates against her for failing to fulfill traditional sex stereotypes.

59.     Due to the anguish and humiliation she experienced as a result of Defendant's actions, Plaintiff took annual leave for the balance of her February 7 shift, as well as February 8 and February 11. Plaintiff received approval from her superiors for the leave.

60.     When Plaintiff returned to work on February 12, 2025, Lead Officer Fausto Rodriguez Martinez told her he had heard a rumor that she had been fired based on the February 7 Directive.

61.     On February 12, Plaintiff discovered that TSA management codified the February 7 Directive into the Agency's Standard Operating Procedures through the issuance of a "Frequently Asked Questions" ("FAQ") document.

62.     The FAQ was prepared by the Civil Rights & Liberties Ombudsman and Traveler Engagement.

63.     The FAQ memorialized that "transgender officers will no longer engage in pat-down duties, which are conducted based on both the traveler's and officer's biological sex."

64.     The FAQ also mandated that "intimate facilities within a TSA-controlled space dedicated for use by either 'females' or 'males' are designated by sex and not identity. Employees must use such facilities consistent with their sex, as defined in the EO."

65.     The FAQ confirmed that MD 900.3 "and its associated Handbook has been rescinded."

66.     The FAQ also stated: "any trainings that inculcate or promote gender ideology" will be cancelled, recognition of Pride Month is "discontinued," the use of "Gender X" and "pronouns" in email signatures and TSA forms is forbidden, and references to "gender identity" and "transgender" have been removed from TSA's Equal Employment and Nondiscrimination Notices.

67.     In late January and early February 2025, TSA removed "gender expression" and "gender identity" from the "Protected Bases" listed in its Anti-Harassment Program, and deleted all references to "gender expression, gender identity and [ ] transgender" in the Program's frequently asked questions.

68.     TSA intended to remove anti-discrimination and anti-harassment protections for transgender TSA employees, including Plaintiff.

69.     Because of the February 7 Directive, Plaintiff is prohibited from performing a significant portion of her TSO job functions.

70.     Defendant prohibits Plaintiff from conducting the pat-downs necessary to clear some airline passengers to go through the checkpoint. Thus, she can no longer perform these functions of her job as a Passenger Screening Officer.

71.     Defendant prohibits Plaintiff from performing full-body or partial pat-downs. Thus, she can no longer perform these functions of her job as a Floor Officer.

72.     Defendant limits Plaintiff from undertaking her TSO job duties as a Passenger Screening Officer as compared to non-transgender TSOs.

73.     Defendant limits Plaintiff from undertaking her TSO job duties as a Floor Officer as compared to non-transgender TSOs.

74.     There are significantly fewer female TSOs as compared to male TSOs. Because of TSA's directive disallowing Plaintiff from performing pat-downs, her female colleagues are now forced to step away from their normal duties to perform a higher number of screenings and pat-downs.

75.     Female TSOs have expressed frustration that, because of the prohibition on Plaintiff's ability to perform pat-downs, they now must conduct additional pat-downs and body scanner screenings, which adds to their already heavy burden during their shifts.

76.     On February 12, 2025, Supervisor Scott Prentice told Plaintiff that there was an issue with low morale among female officers due to this additional strain.

77.     On February 13, Officer Stephen O'Shea requested that Plaintiff conduct a pat-down on a female passenger in a wheelchair. Because of the prohibition on her conducting pat-downs, she was forced to share with him the details of the February 7 Directive, thereby subjecting her gender identity to unwanted attention. As a result of the February 7 Directive, Officer O'Shea had to elicit help from another female officer who was already occupied with another task. The female passenger witnessed this entire interaction and demanded to know why it was taking so long to locate an officer to perform a pat-down.

78.     On February 15, Lead Officer Rodriguez Martinez instructed Plaintiff to appoint another female officer to complete a passenger pat-down, even though Plaintiff was unoccupied, and the other female officer was helping passengers divest items into the x-ray. Plaintiff shared with Officer Rodriguez Martinez that it was humiliating for her to be prohibited from performing the job duties of her position.

79.     Due to the discriminatory directive, Plaintiff has regularly been compelled to ask female co-workers who were otherwise occupied with other job duties, to perform pat-downs on her behalf.

80.     The February 7 Directive requires Plaintiff to ask for assistance each time her job duties would otherwise require her to perform pat-downs, thereby exposing her gender identity to co-workers, supervisors, and airline passengers.

81.     The February 7 Directive prevents or impedes Plaintiff from attaining career advancement, promotions, and greater compensation at TSA, including by limiting her ability to perform all the duties required to obtain specialized certifications or positions of increased responsibility.

82.     If left unchanged, the February 7 Directive will prevent Plaintiff from obtaining career advancement, promotions, greater compensation, specialized certifications, and increased job responsibilities on the same terms as they are available to non-transgender TSOs.

83.     Acting Lead TSOs are required as a part of their job duties to conduct pat-downs, to instruct subordinate TSOs to perform pat-downs, and to oversee TSOs in the performance of pat-downs.

84.     Lead TSOs are required as a part of their job duties to conduct pat-downs, to instruct subordinate TSOs to perform pat-downs, and to oversee TSOs in the performance of pat-downs.

85.     Acting TSO Supervisors are required as a part of their job duties to conduct pat-downs, to instruct subordinate TSOs to perform pat-downs, and to oversee TSOs in the performance of pat-downs.

86.     TSO Supervisors are required as a part of their job duties to conduct pat-downs, to instruct subordinate TSOs to perform pat-downs, and to oversee TSOs in the performance of pat-downs.

87.     TSO Managers are required as a part of their job duties to oversee TSOs in the performance of pat-downs.

88.     Instructors are required as a part of their job duties to instruct and train TSOs on pat-down procedures.

89.     Acting Leads, Leads, Acting Supervisors, and Supervisors are often tasked with performing certain pat-down techniques in escalated situations.

90.     The ability to conduct certain pat-down procedures is a job requirement for Supervisors and Acting Supervisors.

91.     The positions of Acting Lead, Lead, Instructor, Acting Supervisor, Supervisor, and Manager, are positions of greater responsibility and compensation as compared to a D-Band TSO.

92.     TSA considers prior service in the positions of Lead or Supervisor to be a critical qualification for promotion to Manager, Instructor, and Inspector.

93.     The Coaching, Passenger Support Specialist, and ATLAS (Advanced Threat Local Allocation Strategy) certifications require conducting pat-downs.

94.     The Coaching certification requires the ability to train TSOs on how to conduct pat-downs. Coaches oversee the phase-two training of TSOs, which includes training on pat-downs, wheelchair pat-downs, and partial pat-downs.

95.     Passenger Support Specialists regularly conduct pat-downs upon request for passengers with disabilities or touch aversion.

96.     ATLAS certified officers are required to perform pat-downs.

97.     The Coaching, Passenger Support Specialist, and ATLAS certifications come with increased responsibility or compensation for the certified officer. TSA values these certifications when considering applicants for Lead, Instructor, Supervisor, and Manager positions.

98.     TSOs at Dulles International Airport are required to obtain a Coaching certification after two years of employment.

99.     EO 14168 and the TSA FAQ prohibit Plaintiff from using the women's restroom on TSA property.

100.    "Equal access to restrooms is a significant, basic condition of employment." *Lusardi*, 2015 EEOPUB LEXIS 896, *27.

101.    Prior to February 7, 2025, Plaintiff used the women's restroom on TSA property as needed and without incident.

102.    Because of EO 14168 and the associated TSA FAQ, Plaintiff is not permitted to use the women's restroom inside of the TSA-secured area on the 4th floor of 45045 Aviation Drive, Dulles, VA 20166. This is the restroom closest to the TSA training classrooms. Consequently, whenever she is in training, she must leave the TSA-secured area to access the restroom. When she is ready to re-enter the training area, she must ring the door buzzer and wait for a colleague to let her back into the classroom.

103.    EO 14168 and the associated TSA FAQ do not limit restroom use by non-transgender TSOs.

104.    In implementing EO 14168, TSA intended to prevent Plaintiff and other transgender TSA employees from accessing TSA-controlled restrooms that align with their gender identity.

105.    TSA prohibited Plaintiff from using the women's restrooms because TSA viewed her as failing to conform to the sex stereotype propagated by EO 14168.

106.    TSA prohibited Plaintiff from using women's restrooms based on traits or actions it does not question in members of a different sex.

107.    On March 11, 2025, Jason L. Nelson, TSA's Assistant Administrator, Human Capital, issued an advisory memorandum, which, among other things, detailed TSA's policy regarding shift trades. That policy outlines the circumstances under which employees are permitted to trade shifts or pick up additional shifts from other employees.

108.    The March 11, 2025, advisory memorandum reiterated TSA's policy that employees on "limited duty" are not permitted to exchange scheduled work hours with other employees or pick up additional shifts from colleagues.

109.    Because the February 7 Directive prohibits her from performing pat-downs, TSA thereby considers Plaintiff to be a "limited duty" TSO.

110.    TSA placed Plaintiff in the category of "limited duty" only because the February 7 Directive prohibits her from performing pat-downs due to her gender identity.

111.    TSA's February 7 Directive did not cause any non-transgender TSOs to be placed in the category of "limited duty."

112.    Because TSA placed Plaintiff in the category of "limited duty," TSA policies prohibit her from obtaining shifts through a shift trade or picking up extra shifts from her TSO colleagues.

113.    The February 7 Directive did not prohibit non-transgender TSOs from obtaining shifts through a shift trade or picking up extra shifts from their TSO colleagues.

114.    On or around May 6, 2025, Plaintiff's co-worker told her that she was no longer comfortable working with her because she is transgender. The co-worker told Plaintiff that she believes private screening should only be done by an officer of the same biological sex because of "the law." Prior to that time, this co-worker had not expressed to Plaintiff that she had any discomfort working with her because she is transgender.

115.    Plaintiff was so upset by the May 6 interaction that she had to leave work early that day, taking 1.5 hours of her accrued sick leave in order to do so. Plaintiff received prior approval from her superiors for the leave.

116.    On June 30, 2025, Plaintiff successfully completed her probationary period with TSA, and the Agency converted her to non-probationary status, recognizing her continued performance in alignment with TSA's legitimate expectations.

117.    TSA's continued application of the February 7 Directive and FAQ harms and will continue to harm Plaintiff, including by limiting her ability to perform the full scope of her job duties, impeding her advancement within the Agency, disallowing her use of TSA facilities, and continually outing her to colleagues and airline passengers.

118.    As a result of Defendant's discrimination, Plaintiff suffered and continues to suffer anxiety, depression, fear, feelings of uncertainty, crying spells, grief, and low mood. Plaintiff experienced and continues to experience anger, frustration, embarrassment, and humiliation as a result of Defendant's decision to prohibit her from doing much of her job, single her out, and stigmatize her due to her gender identity.

## COUNT ONE
**Discrimination Based on Sex and Gender Identity in violation of Title VII of the Civil Rights Act of 1964 42 U.S.C.2000e, as amended**

1.    Plaintiff incorporates by reference each of the allegations contained in the preceding paragraphs of this Complaint as if set forth here in full.

2.    Discrimination based on transgender identity necessarily entails discrimination based on sex.

3.    On their faces, TSA's February 7 Directive and the TSA FAQ are sex-based classifications which prohibit Plaintiff from performing key functions of her job and utilizing intimate spaces that other persons of her gender are freely able to utilize, solely because she is transgender.

4.      TSA intentionally discriminated against Plaintiff when it imposed disadvantageous, harmful changes with respect to the terms, conditions, and privileges of her employment.

5.      By prohibiting Plaintiff from performing pat-downs, Defendant changed the terms, conditions, and privileges of her employment.

6.      By prohibiting Plaintiff from accessing women's restrooms on TSA-controlled property, Defendant changed the terms, conditions, and privileges of her employment.

7.      TSA's changes to the terms, conditions, and privileges of Plaintiff's employment are adverse because they prohibit her from performing her TSO job duties, limit her opportunities to obtain prestigious certifications, limit her opportunities for career advancement, limit her ability to attain greater pay and benefits, prohibit her from participating in two-way shift trades or shift pickups, prohibit restroom use consistent with her gender identity, and subject her to regular stigma, unwanted attention, and exposure of her gender identity.

8.      TSA changed the terms and conditions of Plaintiff's employment because she is transgender.

9.      TSA revoked Plaintiff's job duties and restroom access because of attributes it tolerates in individuals of another sex.

10.      TSA discriminated against Plaintiff based on her sex when it implemented restrictions on her job duties and access to restrooms because she failed to conform to the female sex stereotype outlined in EO 14168 and TSA's implementing directives.

11.      TSA treated Plaintiff worse than non-transgender TSOs with whom she is similarly situated. No non-transgender TSOs were prohibited from conducting pat-downs or using restrooms that align with their gender as a result of the February 7 Directive or TSA FAQ.

12. The February 7 Directive and the associated FAQ discriminate against Plaintiff because of her transgender identity by disparaging transgender people, stigmatizing transgender employees, removing legal protections for transgender employees, and eliminating systemic recognition of transgender employees.

13. Defendant discriminated against Plaintiff because of her sex and gender identity in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e.

14. As a direct and proximate result of Defendant's actions, Plaintiff suffered and continues to suffer reputational harm, lost potential earnings and benefits, diminished ability to advance in her career, increased medical costs, emotional distress, loss of enjoyment of life, and anxiety.

## PRAYER FOR RELIEF

WHEREFORE, the premises considered, Plaintiff respectfully prays that this Honorable Court:

1. Enter judgment in favor of Plaintiff;

2. Enter judgment against Defendant U.S. Department of Homeland Security;

3. Declare Defendant's conduct in violation of Title VII of the Civil Rights Act of 1964;

4. Enjoin Defendant's enforcement of the February 7 Directive, the TSA FAQ, and any associated policy changes;

5. Award Plaintiff damages for all damages available to her under the law;

6. Award Plaintiff compensatory damages in an amount to be determined by a jury;

7. Award Plaintiff reasonable attorneys' fees, costs, and expenses;

8. Award Plaintiff pre-judgment interest and post-judgment interest;

9.      Grant Plaintiff such equitable relief as is just and proper;

10.     Grant such other relief as this Court deems just and proper.


Date: November 7, 2025                        Respectfully submitted,

                                              */S/ CARLA D. BROWN*
                                              Carla D. Brown, VSB 44803
                                              CHARLSON BREDEHOFT COHEN
                                              BROWN & NADELHAFT, P.C.
                                              11260 Roger Bacon Drive, Suite 201
                                              Reston, VA 20190
                                              (703) 318-6800
                                              cbrown@cbcblaw.com

                                              */S/ JONATHAN C. PUTH*
                                              Jonathan C. Puth*
                                              Kelsey S. Speyer**
                                              CORREIA & PUTH, PLLC
                                              1400 16th Street NW, Suite 450
                                              Washington, D.C. 20036
                                              (202) 602-6500
                                              jputh@correiaputh.com
                                              kspeyer@correiaputh.com
                                              * *Pro hac vice* motion pending
                                              ** *Pro hac vice* motion forthcoming

                                              *Counsel for Plaintiff*