**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
(Alexandria Division)**

| | |
|---|---|
| DANIELLE MITTEREDER<br><br>Plaintiff,<br><br>v.<br><br>KRISTI NOEM, Secretary of Homeland Security<br>U.S. DEPARTMENT OF HOMELAND<br>SECURITY<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)  C.A. No. 1:25-cv-01991 (MSN/IDD)<br>)<br>)<br>)<br>)<br>)<br>) |

## PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

In moving to dismiss Plaintiff's Complaint, Defendant downplays the significant harms she imposed on Plaintiff and seeks application of a heightened standard of proof at odds with the statutory language and binding Fourth Circuit law. In 1972, Congress amended the Civil Rights Act of 1964 ("Title VII") to provide sweepingly broad protections for federal employees, mandating that "[a]ll personnel actions affecting employees . . . shall be made free from any discrimination" on the basis of sex and other protected characteristics. 42 U.S.C. § 2000e-16(a). In 2020, the Supreme Court held that "it is impossible to discriminate against a person for being . . . transgender without discriminating against that individual based on sex," thereby holding that gender identity discrimination is sex discrimination under Title VII. *Bostock v. Clayton County*, 590 U.S. 644, 660 (2020). In blatant violation of these legal prohibitions, in February 2025, Defendant implemented a directive that bars Plaintiff and all other transgender Transportation Security Officers ("TSOs") from conducting passenger screening pat-downs, based solely on gender identity. By implementing this directive, Defendant prohibits Plaintiff from conducting

core functions of her job, impedes her career advancement, and subjects her identity to unwanted and undue scrutiny each workday.

Defendant does not deny that Plaintiff is affected by this directive solely because she is transgender—that much is clear. *See* Def's Mem. of Law in Supp. of Mot. to Dismiss, at 2-3 (Jan. 26, 2026) ("Def. Mem."). Instead, Defendant argues that Plaintiff's Complaint must be dismissed under Rule 12(b)(6) because the government is permitted to discriminate against Plaintiff, so long as it does so below a "significance" threshold, a threshold squarely at odds with the plain language of the statute and governing case law.

Although the heightened requirement that adverse actions must be "significant" to be actionable under Title VII permeated case law for decades (with particular force in the Fourth Circuit), that standard was swept away by the Supreme Court's 2024 decision in *Muldrow v. City of St. Louis*. In the wake of *Muldrow*, the Fourth Circuit has repeatedly held in public sector cases that "significance" may not be imposed as a requirement to make out a claim under Title VII, thereby foreclosing any argument to the contrary by Defendant.[1]

Defendant's entreaty for a heightened threshold is also immaterial. Even if a significance standard were (erroneously) applied, it is amply clear that Plaintiff has pled "significant" personnel

---

[1] Today, Plaintiff filed her First Amended Complaint, withdrawing allegations concerning Defendant's restrictions on her use of restrooms in alignment with her gender identity. After Plaintiff filed her November 7, 2025 Complaint, the American Civil Liberties Union ("ACLU") filed a class action in the U.S. District Court for the District of Columbia, challenging the Trump Administration's policy prohibiting transgender federal employees from using restrooms that conform with their gender identity. *See generally Withrow v. United States*, No. 1:25-4073 (D.D.C. Nov. 21, 2025). That litigation concerns the same legal issue asserted in Plaintiff's original Complaint, against the same parties (the Administration, including Kristi Noem), whose interests are represented by the same U.S. Department of Justice. Plaintiff is included in the putative class, and her legal interests will be adequately represented by class counsel at the ACLU Foundation, Democracy Forward, and Arnold & Porter Kaye Scholer LLP. Efficiency and judicial economy will be served by having those claims determined in a single forum.

actions. Plaintiff's November 7, 2025, Complaint asserts that Defendant's overtly discriminatory policy relegates her to the status of a second-class TSO, denies her the ability to obtain promotions, certifications, and shifts as compared to non-transgender TSOs, and subjects her gender identity to scrutiny, undue exposure, and criticism in her workplace. This categorical ban on Plaintiff's ability to conduct her job duties is a targeted attack on her protected characteristic (gender identity) and human dignity, imposing highly significant harm.

Plaintiff's well-pled Complaint asserts plausible and compelling facts sufficient to maintain a claim of discrimination in violation of Title VII, demonstrating that the personnel actions Defendant imposed upon her, explicitly on account of sex, fall comfortably within Title VII's mandate that "[a]ll personnel actions affecting employees . . . be made free from any discrimination." 42 U.S.C. § 2000e-16(a). Defendant's Motion should be denied.

## FACTS

Plaintiff, a transgender woman, applied for a position as a TSO with the Transportation Security Administration ("TSA") in the summer of 2023. Compl. ¶¶ 11-12.[2] The TSO job announcement listed "pat-downs" among the job duties. *Id.* ¶ 12. The TSO Job Analysis Tool denotes that "performing physical and information-based screening of people"—otherwise known as pat-downs—is a core TSO job duty. *Id.* ¶ 18.

From the time she started her employment with TSA, Plaintiff identified and presented as female and was trained to conduct pat-downs of female passengers. *Id.* ¶¶ 16-17, 27. In October 2024, Plaintiff completed TSO training and began performing her job duties independently, including passenger pat-downs. *Id.* ¶¶ 31-32. During every shift, TSOs, including Plaintiff, rotate through the Positions, including the Passenger Screening Officer Position and Floor Officer

---

[2] The citations herein reference Plaintiff's original Complaint filed November 7, 2025.

Position; until February 2025, Plaintiff conducted several dozen pat-downs per shift. *Id.* ¶¶ 19-21, 33. Prior to February 2025, Plaintiff performed her job duties, including pat-downs, competently and without complaint. *Id.* ¶¶ 34-36.

On January 20, 2025, President Trump issued Executive Order ("EO") 14168, *Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*, which denied the very existence of transgender individuals. *Id.* ¶¶ 38-39. The EO mandated that Agencies implement the EO, including by removing all policies that "promote or otherwise inculcate" something it called "gender ideology," and by seeking to revoke established legal protections for transgender individuals. *Id.* ¶¶ 44-46.

On February 7, 2025, TSA management informed Plaintiff that she and all other transgender TSOs were thereafter prohibited from conducting passenger screening pat-downs. They told Plaintiff that this prohibition was a direct result of the EO, and that the only reason she was prohibited from conducting pat-downs was because she is transgender. *Id.* ¶¶ 48, 50, 53. From that day forward, Defendant has barred Plaintiff from performing pat-down job duties because of her gender identity. ¶¶ 54-57. TSA also revoked all references to gender identity in its Handbook and training materials and removed protections for transgender employees from non-discrimination and anti-harassment policies. *Id.* ¶¶ 65-67.

As a result of Defendant's sex-based pat-down ban, TSA prohibits Plaintiff from performing critical aspects of her TSO job. *Id.* ¶¶ 69-71. Because she can only perform a limited scope of TSO duties, TSA considers her to be a "limited duty" TSO, thereby prohibiting her from exchanging scheduled work hours with other employees or picking up additional shifts from colleagues. *Id.* ¶¶ 107-109, 112.

4

In enacting the gender-identity based prohibition on pat-down duties, Defendant has prevented or impeded Plaintiff from attaining career advancement, promotions, and greater compensation at TSA. *Id.* ¶ 81. Conducting, instructing, and/or overseeing pat-downs are requirements for the positions of Acting Lead, Lead, Supervisor, Manager, and Instructor, and for the Coaching, Passenger Support Specialist, and ATLAS (Advanced Threat Local Allocation Strategy) certifications. *Id.* ¶¶ 81-98. Because Plaintiff can no longer meet the required qualifications for these promotions or certifications, she is blocked from virtually all paths for career growth at TSA. *Id.* ¶¶ 81, 91-92, 97-98.

Defendant's prohibition on Plaintiff's performance of her job duties has also imposed serious adverse consequences upon her work conditions. While all TSOs collectively rotate through each Position during their shifts, unlike her non-transgender colleagues, each time Plaintiff encounters a situation that requires a pat-down, she is not permitted to clear passengers through the checkpoint and she must instead summon another colleague, who is already engaged in other job functions, to perform the job she was trained to do. *Id.* ¶¶ 74, 79-80. Consequently, Plaintiff is routinely "outed" as transgender to colleagues, supervisors, and airline passengers and subjected to humiliation and embarrassment. *Id.* ¶¶ 77-78, 80, 118. Defendant's ban has created workplace tensions, including added unwanted focus on Plaintiff's gender identity, as other female TSOs have expressed frustration over their need to perform additional duties to make up for the forced restriction on Plaintiff's performance of pat-downs. *Id.* ¶¶ 74-76, 79. Further, TSA's blatant revocation of rights for transgender TSOs has emboldened biased colleagues to confront Plaintiff with negative comments about her gender identity, to Plaintiff's great distress. *Id.* ¶¶ 114-115, 118.

While Plaintiff's identity as a transgender woman was never at issue in her workplace before February 2025, it is now the primary factor dictating whether she can succeed, advance, and thrive in her chosen career as a Transportation Security Officer.

**ARGUMENT**

Defendant's overtly discriminatory pat-down ban has subjected Plaintiff to daily assaults on her dignity, created friction in her workplace, drawn adverse and unwanted attention to her gender identity, and impeded her chances for career growth. By any measure, that harm is "significant." Imagine if Defendant had imposed a policy barring Black TSOs from performing pat-downs on White passengers; no one, not even Defendant, would be in a position to argue that such discrimination is lawful because the harms are not "significant." The policy here is just as odious and equally unlawful under Title VII.

Title VII prohibits "any discrimination" by the federal government in "[a]ll personnel actions affecting employees." 42 U.S.C. § 2000e-16(a). The statutory language is expansive and without limitation. Seeking addition of an unwritten "significance" requirement into the statute, Defendant attempts to give life to the "materially adverse action" standard that persisted for decades in the Fourth Circuit but was overruled by the Supreme Court in its 2024 *Muldrow* decision. The Court in *Muldrow* held that "[t]o demand 'significance' is to add words . . . to the statute Congress enacted," *Muldrow v. City of St. Louis*, 601 U.S. 346, 355 (2024), the very thing Defendant misguidedly urges here.

In fact, the challenge mounted by Defendant has been foreclosed by the Fourth Circuit's post-*Muldrow* decisions, which hold that under Title VII, federal sector employees need not demonstrate a "significant" adverse employment action, and that all authorities requiring such "significance" were abrogated by *Muldrow*. Defendant's Motion should be denied.

1. The plain language "all personnel actions affecting employment" must be read broadly, in accordance with its terms.

Title VII of the Civil Rights Act of 1964 made it unlawful "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).  In 1972, Congress passed the Equal Employment Opportunity Act of 1972, which accorded "aggrieved federal employees or applicants . . . the full rights available in the courts as are granted to individuals in the private sector under title VII." *Chandler v. Roudebush*, 425 U.S. 840, 841 (1976) (brackets omitted) (quoting S. Rep. No. 92-415, p. 16 (1971)).  In amending Title VII to include federal employees, Congress used expansive terms, mandating that "[a]ll personnel actions affecting employees . . . shall be made free from any discrimination." 42 U.S.C. § 2000e-16(a).

Counterintuitively, Defendant claims that this provision "*requires*" courts to accord Title VII protections only when a challenged personnel action is "significant." *See* Def. Mem. at 9 (original emphasis). To the contrary, neither "significant" nor any other limitation can be found in the sweeping plain language of the statute. *See* 42 U.S.C. § 2000e-16(a). By using the word "all," Congress made clear its intent to encompass the full array of discriminatory actions that can take place in the employment setting. *See Gomez-Perez v. Potter*, 553 U.S. 474, 487 (2008) ("Title VII's federal-sector provision[] contains a broad prohibition of 'discrimination,' rather than a list of specific prohibited practices."); *see also Laurent-Workman v. Wormuth*, 54 F.4th 201, 214 (4th Cir. 2022) ("[T]he federal-sector provision regulates *all* personnel actions. This means the federal-sector provision outlaws a broader range of employer conduct than the substantive discrimination provision, which covers activity related to compensation, terms, conditions, or privileges of employment. . . .[M]any decisions involving human resources

7

constitute personnel actions despite falling short of being ultimate employment decisions." (citation modified)).

The Supreme Court holds that expansive statutory terms must be given their full breadth and may not be narrowed by implication. "'All' excludes the idea of limitation." *McLean v. United States*, 226 U.S. 374, 383 (1912). Where Congress uses expansive terms, there is no basis for imposing limitations. *See United States v. Gonzales*, 520 U.S. 1, 5 (1997). The terms "[a]ll personnel actions affecting employees" in the federal-sector provision of Title VII are broad and unambiguous; thus, their plain meaning should be applied, without restriction. *See Desert Palace, Inc. v. Costa*, 539 U.S. 90, 98 (2003) ("[W]here, as here, the words of the statute are unambiguous, the judicial inquiry is complete." (citation omitted)). Defendant's attempt to impose limiting language on a statute that is broadly inclusive by its plain terms, should be rejected.

2. The Supreme Court abrogated any heightened burdens for discrimination claims under Title VII in *Muldrow v. City of St. Louis*.

Defendant's arguments for a "significance" standard must be rejected where both the Supreme Court and the Fourth Circuit have abrogated cases requiring any such standard. Prior to 2024, the Fourth Circuit had consistently held in both federal sector and private sector cases that actionable discrimination was limited to decisions that had a "significant" adverse effect on employees. *See, e.g.*, *Boone v. Goldin*, 178 F.3d 253, 256-57 (4th Cir. 1999) ("[R]eassignment can only form the basis of a valid Title VII claim if the plaintiff can show that the reassignment had some significant detrimental effect . . . . [A]bsent any decrease in compensation, job title, level of responsibility, or opportunity for promotion, reassignment . . . does not constitute an adverse employment action even if the new job does cause some modest stress not present in the old position."); *James v. Booz-Allen & Hamilton, Inc.*, 368 F.3d 371, 375-376 (4th Cir. 2004) ("The mere fact that a new job assignment is less appealing to the employee . . . does not constitute

8

adverse employment action. A reassignment can only form the basis of a valid Title VII claim if the plaintiff can show that the reassignment had some significant detrimental effect." (citation modified)).[3]

However, that body of law was overturned in 2024 when the Supreme Court held that the plain language of Title VII precludes a requirement that an employee prove "significant" harm:

> "Discriminate against" means treat worse, here based on sex.  But neither that phrase nor any other . . . establish[es] an elevated threshold of harm. To demand "significance" is to add words . . . to the statute Congress enacted. It is to impose a new requirement on a Title VII claimant, so that the law as applied demands something more of her than the law as written.

*Muldrow*, 601 U.S. at 355 (citation omitted) (citing *Bostock*, 590 U.S., at 657-58, 681). The Court in *Muldrow* held that Title VII prohibits practices that "treat a person worse because of sex or other protected trait." *Id.* at 354 (citation modified). "As appellate decisions reveal, [adding a significance threshold] can disregard varied kinds of disadvantage." *Id.* at 355. Thus, the Court held, a plaintiff alleging discrimination under Title VII need only show that a job action subjected her to "some harm." *Id*. at 354-55.

In *Muldrow*, the Court cited two cases from the Fourth Circuit, the federal sector *Boone* decision and the private sector *James* decision, as examples of an appellate court that had inappropriately applied the heightened "significance" standard, thereby explicitly abrogating those authorities.  *See id*. at 353 n.1, 355. Consequently, decades of case law permeating the Fourth Circuit that demanded a showing of "significant" harm was swept away. Although *Muldrow* focused on the private-sector provision of Title VII, its central

---

[3] Prior to 2024, nearly every circuit aside from the D.C. Circuit had required employees challenging discriminatory actions under Title VII to meet some heightened threshold of harm (significant, serious, etc.). *See Muldrow,* 601 U.S., at 353 n.1. The D.C. Circuit overruled its precedent requiring "material adversity" in 2022. *See id*. (citing *Chambers v. District of Columbia*, 35 F. 4th 870, 872, 876-77 (D.C. Cir. 2022) (*en banc*)).

tenet is clear—courts should not import language into Title VII in an attempt to limit Congress's expansive protections for employees. *See id*. at 355.

In consideration of *Muldrow*, the Fourth Circuit now holds in federal sector cases that "[a]n employee need not show that the harm was significant, serious, substantial, 'or any similar adjective suggesting that the disadvantage to the employee must exceed a heightened bar.'" *Barnhill v. Bondi*, 138 F.4th 123, 129 n. 6 (4th Cir. 2025) (quoting *Muldrow*, 601 U.S. at 355)*; see also Herkert v. Bisignano*, 151 F.4th 157, 164 (4th Cir. 2025) ("[T]he Supreme Court [in *Muldrow*] abrogated our decision in *James* and held that a plaintiff alleging Title VII discrimination need not show that harm incurred from a reassignment was 'significant.'") (citation omitted)). In *Hansley v. Dejoy*, the Court noted that *Muldrow* had rejected any "significant-harm requirement," and held that any prior cases suggesting otherwise "are no longer good law." No. 23-1426, 2024 U.S. App. LEXIS 30433, at *5-6 (4th Cir. Dec. 3, 2024). Given these authorities, any requirement of "significance" for personnel actions under Title VII, as Defendant urges here, would be erroneous.

Notwithstanding the broad reach of *Muldrow* and the subsequent binding Fourth Circuit authority banishing any "significance" threshold from consideration in Title VII matters, Defendant insists that Plaintiff must allege a "*significant* change in employment status." Def. Mem. at 11. Defendant argues that this abrogated standard somehow lives on in part by referencing pre-*Muldrow* decisions that stem from *Boone*, *James*, and other decisions requiring "significance" that "are no longer good law." *Hansley*, 2024 LX 30433, at *6; *see* Def. Mem. at 8, 11, 19 (citing *Harris v. Wormuth*, No. 1:23-cv-742 (LMB/JFA), 2023 U.S. Dist. LEXIS 167946, at *9-10 (E.D. Va. Sep. 20, 2023); *Abdelhamid v. Sec'y of*

*the Navy*, 525 F. Supp. 3d 671, 684-85 (E.D. Va. 2021); *Carter v. Bridenstine*, No. 17-1752 (ABJ), 2020 U.S. Dist. LEXIS 58623, at \*34 (D.D.C. Mar. 31, 2020)). Each of those cases and others cited by Defendant rely on authorities that have been abrogated.

       3.   <u>*Muldrow* mandates that courts enforce the full breadth of Title VII's protections, without limitation by unrelated language in the Civil Service Reform Act.</u>

Defendant argues that this Court must overlook the plain language of Title VII, the Supreme Court's *Muldrow* decision, and binding Fourth Circuit precedent, and instead urges that this case be decided by an unwarranted interpretation of *dicta* in *Babb v. Wilkie*, a Supreme Court case analyzing the Age Discrimination in Employment Act ("ADEA"). *See* Def. Mem., at 7-11.[4] The Court in *Babb* noted in *dicta* that the ADEA "concerns 'personnel actions,'" and that a different statute, the Civil Service Reform Act of 1978 ("CSRA") 5 U.S.C. § 2302(a)(2)(A), "broadly defines a 'personnel action' to include most employment-related decisions, such as appointment, promotion, work assignment, compensation, and performance reviews." *Babb v. Wilkie*, 589 U.S. 399, 405 (2020). To be clear, the Court in *Babb* never stated, let alone held, that 5 U.S.C. § 2302(a)(2)(A) defined the term "personnel action" for Title VII; rather, it observed only that the term is "easy to understand" (*i.e.*, its language is plain), and that the CSRA "interpretation" is "consistent with the term's meaning in general usage." *Babb*, 594 U.S. at 405. The Court then "assume[d] that it has the same meaning under the ADEA."

In arguing for limiting the otherwise expansive language of Title VII by the narrower terms of a different statute (the CSRA), Defendant seeks to elevate the "assumption" made in *dicta* in

---

[4] The decision in *Babb* did not concern whether the discrimination involved a "personnel action" but rather whether the term "free from discrimination" required a relaxed burden of proof, holding that a federal employer violates the ADEA if age plays any part in the decision, even if age was not a "but-for" cause of the employment decision. 589 U.S. 399, 406-07 (2020).

*Babb* to binding precedent and suggests that the CSRA amended Title VII's definition of the term "personnel action," which it clearly did not. "[T]he *Babb* Court's assumption was just that—an assumption." *Phelan v. Noem*, No. 24-939 (LLA), 2025 U.S. Dist. LEXIS 189028, at \*19 (D.D.C. Sept. 25, 2025). "That observation has no effect on whether that definition must govern Title VII federal-sector claims." *Doe v. Austin*, No. 22-3474 (RC), 2024 U.S. Dist. LEXIS 34915, at \*28 (D.D.C. Feb. 29, 2024).

Indeed, none of the cases Defendant cites hold that the CSRA defined the term "personnel action" in Title VII, and all recognize the language from *Babb* is *dicta*. *See*, *e.g.*, *Abdelhamid*, 525 F. Supp. 3d at 684 ("[I]t is unclear whether [the CSRA] definition of 'personnel action' applies to Title VII."). For instance, in the non-binding *Chatman v. Hegseth* case relied on by Defendant, the court theorized that a federal sector employee may have to meet a "significance" standard as defined in 5 U.S.C. § 2302(a)(2)(A), but that too appears to be *dicta*. *See Chatman v. Hegseth*, No. 1:24-cv-1585, 2025 U.S. Dist. LEXIS 163832, at \*17 (E.D. Va. Aug. 22, 2025). Moreover, there is no indication the *pro se* plaintiff in *Chatman* mounted any challenge to the government's argument in that regard. *See id*.

Similarly, this Court's decision in *Caleca v. Burns* recognizes that the language in *Babb* was *dicta*; however, it does not take account of the then-recently issued *Muldrow* decision and relies instead on cases abrogated by *Muldrow*, including *James*, the parties apparently never having raised the issue. *See* No. 1:23-cv-1184-MSN-JFA, 2024 U.S. Dist. LEXIS 170545, at \*14-15 (E.D. Va. Sept. 20, 2024). Significantly, *Caleca* was decided before the Fourth Circuit's decisions issued in reliance on *Muldrow*, which prohibit application of any "significance" threshold in federal sector cases. *See Barnhill*, 138 F.4th at 129 n. 6; *Herkert*, 151 F.4th at 164; *Hansley*, 2024 LX 30433, at \*5-6.

Furthermore, Defendant's argument for a more restrictive standard for employees in federal-sector cases runs contrary to the very language of *Babb*: "We are not persuaded by the argument that it is anomalous to hold the Federal Government to a stricter standard than private employers or state and local governments. That is what the statutory language dictates . . . ." *Babb*, 589 U.S. at 411-13. The standard urged by Defendant here, by contrast, would hold the government to a lower standard than its private-sector counterparts, contrary to the statutory language and the holding of *Babb*.[5]

Defendant also misguidedly claims that "it is appropriate to presume that Congress intended that text to have the same meaning in both statutes." *See* Def. Mem. at 8 (quoting *Smith v. City of Jackson*).[6] However, in enacting the prohibition on discrimination for "[a]ll personnel actions affecting employees" in the Equal Employment Opportunity Act of 1972, Congress could not possibly have intended to adopt the limited definition that was enacted *six years later* in the Civil Service Reform Act of 1978, in a different section of the code, and in a statute with different

---

[5] See *Austin*, 2024 LX 34915, at *28 ("Defendant does not grapple with the fact that their argument would hold the federal government to a lower standard than the private-sector."); *McClintock v Garland*, No. 3:20cv1548, 2024 U.S. Dist. LEXIS 166951, at *24 n.9 (M.D. Pa. Sep. 17, 2024) ("[T]here is nothing in the statutory text of [the ADEA] 'to otherwise establish an elevated threshold of harm.' Accordingly, the statute can only be read to encompass various types of discrimination with no reference to severity." (citation omitted) (quoting *Muldrow*, 601 U.S. at 355)).

[6] In *Smith*, the Court observed that "when Congress uses the same language in two statutes [the ADEA and Title VII] having similar purposes, particularly when one is enacted shortly after the other, it is appropriate to presume that Congress intended that text to have the same meaning in both statutes." *Smith*, 544 U.S., at 233. Critically, the Court hinged its presumption on the fact that the ADEA was "derived *in haec verba* from Title VII." *Id*. at 233-34 (quoting *Lorillard* v. *Pons,* 434 U.S. 575, 584 (1978)). Defendant does not suggest and could never suggest here that the language of 5 U.S.C. § 2302(a)(2)(A) (the CSRA) was identical to, had the same purpose, or was derived from Title VII, 42 U.S.C. § 2000e-16(a). To the contrary, the language, purpose, and genesis of the two statutes are highly divergent.

13

purposes. *See* Equal Employment Opportunity Act of 1972, Pub. L. No. 92-261, § 11, 86 Stat. 111 (1972); Civil Service Reform Act of 1978, P. L. 95-454, Title I, § 101(a), 92 Stat. 1114 (1978).

> [L]ater laws that "do not seek to clarify an earlier enacted general term" and "do not depend for their effectiveness upon clarification, or a change in the meaning of an earlier statute," are "beside the point" in reading the first enactment. Congress may have spoken with explicit clarity when it passed [the later statute], but we can say no more than that.

*Gutierrez v. Ada*, 528 U.S. 250, 257-258 (2000) (citation omitted) (quoting *Almendarez-Torres v. United States*, 523 U.S. 224, 237 (1998)).  Simply put, the 1978 definition of "personnel action" in Title 5 of the U.S. Code is utterly "beside the point" in any attempt to divine Congress's intent in mandating that "[a]ll personnel actions affecting employees . . . shall be made free from any discrimination" in Title 42 of the Code in 1972. *See Gutierrez*, 528 U.S. at 258. The entire crux of Defendant's argument, therefore, rests on faulty reasoning.

Defendant's elaborate attempts to manufacture a narrower definition of actionable personnel actions underscore the importance of not reading language into the text of Title VII that does not exist. *See Muldrow*, 601 U.S. at 355 ("To demand 'significance' is to add words—and significant words, as it were—to the statute Congress enacted."). Title VII protects Plaintiff from all discriminatory personnel actions, including the ones at issue here.

4. <u>Plaintiff sufficiently pled that Defendant subjected her to significant personnel actions.</u>

Even if the more stringent standard argued by Defendant applied (which it does not), Plaintiff has pled clear, significant harm affecting her job duties, responsibilities, and working conditions. Plaintiff pled that Defendant's sex-based pat-down ban causes her significant harm, including by blocking her from promotions and opportunities for increased responsibility and pay,

and by subjecting her to daily insults to her dignity and professional competence.[7] Plaintiff set forth in her Complaint the fact that nearly all specialized certifications and jobs of increased responsibility and pay *require* performing, conducting, training, or overseeing pat-downs. Compl. ¶¶ 81-98. Even under the stricter, now abrogated, pre-*Muldrow* standard, actions that reduced an employee's "opportunity for promotion" were considered adverse. *See Boone*, 178 F.3d at 257.[8]

Additionally, as pled in her Complaint, Plaintiff is necessarily on limited-duty because Defendant expressly prohibits her from performing the full scope of her job duties as reflected in the TSO job description. Compl. ¶¶ 107-109, 112. As a result, she cannot exchange scheduled work hours with other employees or pick up shifts from colleagues. *Id.*

In addition to significant harmful changes to her duties and responsibilities, Plaintiff also pled significant changes to her working conditions. In accordance with the Executive Order that denies Plaintiff's existence, Defendant revoked not only Plaintiff's job duties but also anti-discrimination protections for Plaintiff and other transgender employees from TSA policies. Compl. ¶¶ 38-39, 44, 48, 50, 53-57, 65-67. This overt hostility has granted license to prejudiced colleagues to confront Plaintiff about her transgender identity. Compl. ¶¶ 74-76, 79, 114. Whereas

---

[7] Defendant asks this Court to ascribe weight to a policy document that states that transgender employees will not be "adversely affected." *See* Def. Mem. at 15. However, saying a policy is not adverse does not make it so. Defendant also suggests not firing Plaintiff when her probationary period ended amounts to a promotion of sorts, which reflects a misapprehension of federal employee probationary status. *See id*. Plaintiff simply kept her job, with no new responsibilities, job duties, or authority.

[8] Plaintiff need not submit futile applications for advancement in light of the discriminatory policies preventing her from meeting the requirements for promotion. *See Int'l Bhd. of Teamsters v. United States,* 431 U.S. 324, 365-66 (1977); *see also Pinchback v. Armistead Homes Corp*., 907 F.2d 1447, 1451 (4th Cir. 1990). That Plaintiff perseveres and performs well in her job, *see* Def. Mem. at 18-19, also has no bearing on whether Defendant discriminated. *See Peltier v. Charter Day Sch., Inc*., 37 F.4th 104, 135 (4th Cir. 2022) (Keenan, J., concurring) ("We cannot excuse discrimination because its victims are resilient enough to persist in the face of such unequal treatment.").

Plaintiff's gender identity was never a factor at work before this directive, in instances where she would otherwise perform a pat-down, Plaintiff is now forced to out herself to colleagues, supervisors, and airline passengers. *Id.* ¶¶ 77-78, 80. These changes are quintessentially and significantly adverse. On a daily basis, Plaintiff must withstand affronts to her dignity and identity, which fundamentally alters how she must navigate her workplace. *See Grimm v. Gloucester Cty. Sch. Bd.*, 972 F.3d 586, 617-18 (4th Cir. 2020) (explaining that the stigma of being treated differently due to one's transgender identity is "sufficient to constitute harm under Title IX" because it "invite[s] more scrutiny and attention" from others and brands transgender individuals "with a scarlet 'T.'" (citation modified)).

Defendant cites to cases for the proposition that certain job stressors are not actionable under Title VII; however, none of those equate to the harmful actions alleged by Plaintiff here. *See Grimes v. Dep't of Def.*, No. 1:24-cv-1164-MSN-IDD, 2025 U.S. Dist. LEXIS 87602, at *8 (E.D. Va. May 7, 2025) ("negative feedback, ignored complaints, reprimands, requests to cover shifts, denial of telework, and lack of performance evaluations"); *Caleca*, 2024 LX 170545, at *12, *14-15 (criticism, assignment to projects outside of expertise, denying opportunities to work on projects, and failure to provide assistance); *Harris*, 2023 LX 167946, at *10-11 (not taking allegations of discrimination seriously, a fraudulent investigation, and downgrading of an honorary award).[9]

There is simply no comparison between the facts of those cases and Defendant's categorical bar on Plaintiff's performance of a core job duty because she is transgender. Unlike in

---

[9] The single case relied on by Defendant to claim that "[t]his 'refinement of plaintiff's duties or the assignment of new ones' cannot constitute an adverse action under Title VII," Def. Mem. at 19 (quoting *Carter*, 2020 LX 58623 at *34), is no longer good law, having been abrogated by *Chambers*, 35 F.4th at 872.

the *Caleca* decision, which hinged in part on the fact that the plaintiff was removed from a teaching role that "was not part of his regular work responsibilities," 2024 LX 170545, at *16, Plaintiff has asserted that Defendant implemented a complete bar on her performance one of the key job duties of all TSOs—a duty she previously performed dozens of times per day. Compl. ¶¶ 11-12, 18-21, 33. Defendant now prohibits Plaintiff from performing much of her job, based on sex, unlike all her non-transgender colleagues.

Defendant's complete prohibition on Plaintiff's performance of a core job function is cognizable under Title VII. *See Byrd v. Becerra,* No. 22-3746 (TSC), 2024 U.S. Dist. LEXIS 195117, at *17 (D.D.C. Oct. 28, 2024) ("[S]tripping an employee of the duties normally associated with that position or giving an employee significantly different responsibilities suffices to establish an adverse employment action." (citation modified)); *McClintock,* 2024 LX 166951, at * 25-26 (transfer to new work location with changed job duties was an adverse action); *Jensvold v. Shalala*, 829 F. Supp. 131, 136 (D. Md. 1993) ("In this case, however, plaintiff challenges alleged decisions and actions that directly affected the terms and conditions of her employment, including work assignments, the quality of training and guidance she received, and [her superior's] alleged determination that the type of work she was doing did not merit her continued presence at NIMH for a third year of research and publication."); *Palmer v. Shultz*, 815 F.2d 84, 98 (D.C. Cir. 1987) ("The language of 42 U.S.C. § 2000e-16, involved here, is even broader, covering 'all personnel actions' based on sex, regardless of whether the personnel action affects promotions or causes other tangible or economic loss.").

Even assuming application of the errant "significance" standard, Plaintiff has set forth in her Complaint assertions that demonstrate that Defendant's determination to bar her from performing pat-downs because she is transgender is a "significant" personnel action, exacting

17

"significant" harms. Although Defendant may dispute Plaintiff's factual allegations, such disputes do not support dismissal at this early stage. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007) ("Asking for plausible grounds . . . does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence" of unlawful conduct.).

**CONCLUSION**

In implementing the transgender pat-down ban, Defendant has detrimentally altered "the what, where, and when" of Plaintiff's work. *See Muldrow*, 601 U.S. at 354. Plaintiff need only establish that she was harmed by this discriminatory directive, not "that the harm incurred was 'significant' or otherwise exceeded some heightened bar." *Id*. at 347. Plaintiff has asserted ample, lasting harm resulting from Defendant's actions. Defendant's overtly discriminatory policy has worsened Plaintiff's day-to-day job, impaired her ability to advance in her career at TSA, and eliminated her ability to show up to work and be treated with dignity and respect, regardless of her gender identity.

Plaintiff respectfully requests that Defendant's Motion to Dismiss be denied.

Date: February 9, 2026                    Respectfully submitted,

                                          */S/ CARLA D. BROWN*
                                          Carla D. Brown, VSB 44803
                                          CHARLSON BREDEHOFT COHEN
                                          BROWN & NADELHAFT, P.C.
                                          11260 Roger Bacon Drive, Suite 201
                                          Reston, VA 20190
                                          (703) 318-6800
                                          cbrown@cbcblaw.com

/S/ *JONATHAN C. PUTH*
Jonathan C. Puth (admitted *pro hac vice*)
Kelsey S. Speyer (admitted *pro hac vice*)
CORREIA & PUTH, PLLC
1400 16th Street NW, Suite 450
Washington, D.C. 20036
(202) 602-6500
jputh@correiaputh.com
kspeyer@correiaputh.com

*Counsel for Plaintiff*

**CERTIFICATE OF SERVICE**

I hereby certify that on the 9th day of February 2026 I electronically filed the foregoing

with the Clerk of Court using the CM/ECF system, which will send a notification of such filing

(NEF) to the following:

MATTHEW J. MEZGER
PETER B. BAUMHART
Assistant United States Attorneys
Office of the United States Attorney
Justin W. Williams U.S. Attorney's Building
2100 Jamieson Ave.
Alexandria, VA 22314
Tel: (703) 299-3741/3738
Fax: (703) 299-3983
Email: Matthew.Mezger@usdoj.gov
Peter.Baumhart@usdoj.gov

*Counsel for Defendant*

/S/ CARLA D. BROWN
Carla D. Brown, VSB 44803
CHARLSON BREDEHOFT COHEN
BROWN & NADELHAFT, P.C.
11260 Roger Bacon Drive, Suite 201
Reston, VA 20190
(703) 318-6800
cbrown@cbcblaw.com

*Counsel for Plaintiff*

20