**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

|  |  |
|---|---|
| DANIELLE MITTEREDER,<br><br>   Plaintiff,<br><br>   v.<br><br>KRISTI NOEM, Secretary of the Department<br>of Homeland Security,<br><br>   Defendant. | No. 1:25-cv-1991 (MSN/IDD) |

**DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF HER MOTION TO DISMISS THE AMENDED COMPLAINT**

Defendant, in her official capacity as Secretary of Homeland Security and through her undersigned counsel, respectfully submits this memorandum of law in support of her motion to dismiss the amended complaint (Dkt. 22) pursuant to Federal Rule of Civil Procedure 12(b)(6).

**INTRODUCTION**

Plaintiff Danielle Mittereder, a Transportation Security Officer ("TSO") who identifies as a transgender woman, alleges that the Transportation Security Administration ("TSA") is violating Title VII by implementing a policy that precludes Plaintiff from performing pat-downs as part of security screenings. As explained below, Plaintiff's claim fails as a matter of law because the challenged policy does not constitute a personnel action to which the federal-sector provision of Title VII applies. Indeed, this policy does not amount to sort of adverse change to the terms or conditions of Plaintiff's employment that is required to state a claim under Title VII. Accordingly, the Court should grant Defendant's motion and dismiss this action.

1

## BACKGROUND

**A.      Legal Background**

On January 20, 2025, the President issued Executive Order 14,168, *Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*. 90 Fed. Reg. 8615 (Jan. 20, 2025) (the "EO"). As relevant here, the EO announces that "[i]t is the policy of the United States to recognize two sexes, male and female," and defines "sex" as "an individual's immutable biological classification as either male or female," without reference to "the concept of 'gender identity.'" *Id.* at 8615. Thus, under the EO, "'[f]emale' means a person belonging, at conception, to the sex that produces the large reproductive cell," and "'[m]ale' means a person belonging, at conception, to the sex that produces the small reproductive cell." *Id.* The EO directs the Executive Branch to "enforce all sex-protective laws" accordingly, meaning that "[e]ach agency and all Federal employees shall enforce laws governing sex-based rights, protections, opportunities, and accommodations to protect men and women as biologically distinct sexes." *Id.* at 8615–16.

Pursuant to the EO, TSA has issued policy guidance in the form of a Frequently Asked Questions ("FAQs") document, the currently operative version of which took effect on December 11, 2025. *See* Ex. 1.[1] This guidance defines "sex," "female," and "male" consistently with the EO. *Id.* at 1. The guidance further directs that transgender TSOs "will no longer engage in pat-down duties, which are conducted based on both the traveler's and officer's biological sex," nor will those TSOs "serve as a TSA-required witness when a traveler elects to have a pat-down conducted

---

[1] Previous iterations of this guidance were issued on February 11, 2025, February 24, 2025, March 11, 2025, and July 23, 2025. *See* Exs. 2–5. TSA also issued an initial talking points memo on February 7, 2025, addressing the effect of the EO on pat-downs. Ex. 6.

in a private screening area." *Id.* at 2.[2] As a result, performance of pat-down exercises is excluded from transgender TSOs' training, though they may observe the exercises. *Id.*[3] Nonetheless, transgender TSOs "will be certified for all other areas of eligibility upon completion of applicable requirements" and "shall continue to be eligible to perform all other security screening functions consistent with their certifications." *Id.* at 2–3. The inability to perform pat-downs will not "adversely affect[] . . . [transgender TSOs'] ability to be selected for supervisory positions or receive recognitions bonuses, performance awards, promotions, or other increases in salary, benefits, or responsibilities." *Id.* at 3.

A separate TSA policy issued on March 11, 2025, regulates "shift trades," defined as "[t]he voluntary, documented exchange of scheduled work hours between no more than three (3) employees for a minimum of one (1) hour," including "trades for a partial shift or a full shift." Ex. 7, App. C, § B(3). Under this policy, "[e]mployees on limited duty or light duty may only make one-way shift trades off and only with employees with no restrictions." *Id.* § D(2)(i). The policy does not expressly define "limited duty" or "light duty." Nor does it state that transgender TSOs are considered to be on limited duty or light duty because they are precluded from conducting pat-downs.

## B.    Factual Background[4]

Plaintiff Danielle Mittereder is a current employee of the TSA, having joined the agency as a TSO at Dulles International Airport beginning on June 30, 2024. Am. Compl. ¶¶ 1, 14.

---

[2] This restriction on serving as a witness was introduced in the March 11, 2025 iteration of the FAQs. Ex. 4 at 2.

[3] These training limitations were introduced in the February 24, 2025 iteration of the FAQs. Ex. 3 at 2–3.

[4] For purposes of this memorandum, Defendant accepts as true Plaintiff's well-pleaded factual allegations in the amended complaint. However, conclusory allegations, unwarranted deductions

Plaintiff's main job duties, as reflected in the TSO post announcement, are generally as follows: (1) operating equipment to conduct screenings of traveling passengers and items (*e.g.*, baggage, cargo, etc.), (2) conducting screenings and searches of passengers and items, "which may include physical interaction with passengers," and (3) controlling terminal entry and exit points. *Id.* ¶ 12.

During shifts, all TSOs—including Plaintiff—rotate through one of six positions every thirty minutes. *Id.* ¶ 19. Those positions include "Travel Document Checker; Divesting Officer; X-Ray Operator; Property Search Officer; Passenger Screening Officer (using either the Magnetometer or Advanced Imaging Technology); and Floor Officer." *Id.* Relevant to this action is one aspect of two of these six positions. When serving as a Passenger Screening Officer, TSOs "operate screening equipment, including body scanners, 'walk through' metal detectors, and handheld metal detectors." *Id.* ¶ 20. "Under certain circumstances," TSOs are required to conduct a pat-down of passengers. *Id.* When serving as a Floor Officer, TSOs are required to conduct a pat-down "[a]ny time the passenger is unable to use the screening equipment due to a medical condition or voluntarily opts out of using the screening equipment." *Id.* Should that occur, "the Floor Officer of the same gender [as the passenger] must conduct a full-body pat-down of the passenger." *Id.* ¶ 21.

The TSA trained Plaintiff to conduct pat-downs and Plaintiff completed that training in October 2024. *Id.* ¶ 31. From October 2024 through February 7, 2025, Plaintiff performed pat-downs of female passengers. *Id.* ¶ 32. On February 7, 2025, pursuant to the EO, the TSA issued a directive "prohibit[ing] all known transgender TSOs from performing pat-downs." *Id.* ¶¶ 53–55. That directive, according to the amended complaint, prohibited Plaintiff from "performing pat-

---

of fact, unreasonable inferences, and legal conclusions are not entitled to this presumption. *See Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009).

downs from that day forward." *Id.* ¶ 54. Without the ability to conduct pat-downs, Plaintiff speculates that opportunities for "career advancement, promotions, greater compensation, specialized certifications, and increased job responsibilities" will be unavailable on the same terms that they are available for non-transgender TSOs. *Id.* ¶ 81, *see also id.* ¶¶ 82–97. Somewhat contrary to this speculation, "Plaintiff successfully completed her probationary period with TSA and the Agency converted her to non-probationary status" on June 30, 2025, despite not having performed any pat-downs for more than four months. *Id.* ¶ 107. As even Plaintiff admits, the TSA thus "recogniz[ed] her continued performance in alignment with TSA's legitimate expectations," even though Plaintiff was not performing pat-downs. *Id.*

## C.      Procedural History

Plaintiff filed this action on November 7, 2025. *See generally* Dkt. 1. Defendant moved to dismiss the original complaint on January 26, 2026. Dkt. 19. In response, Plaintiff filed an amended complaint on February 9, 2026, Dkt. 22, which mooted Defendant's motion to dismiss the original complaint, *see* Dkt. 25. The amended complaint dropped Plaintiff's previous challenge to TSA's sex-designated bathroom policy, which was also instituted pursuant to the EO, and only puts at issue TSA's pat-down policy. Am. Compl. at 16-18. As Plaintiff sees it, the pat-down policy violates Title VII of the Civil Rights Act of 1964, and to remedy that violation, Plaintiff seeks among other things, damages, a declaratory judgment, and injunctive relief. *Id.* at 18.

<u>**STANDARD OF REVIEW**</u>

A complaint is subject to dismissal if it fails to allege facts that state a plausible claim for relief rising "above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *see also* Fed. R. Civ. P. 12(b)(6); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Iqbal*, 556 U.S. at 678 (quoting

5

*Twombly*, 550 U.S. at 557). Legal conclusions, "naked assertions devoid of further factual enhancement," and "a formulaic recitation of the elements of a cause of action" are insufficient to state a plausible claim. *Id.* (internal quotation marks omitted); *Twombly*, 550 U.S. at 555.

## ARGUMENT

The amended complaint does not state a plausible claim for relief because exempting Plaintiff from pat-down duties is not a "personnel action[]" covered by Title VII's federal-sector provision, 42 U.S.C. § 2000e-16(a).

**A.      Under Title VII's Federal-Sector Provision, Only "Personnel Actions" are Actionable.**

As a federal employee, Plaintiff's Title VII claim proceeds under 42 U.S.C. § 2000e-16(a), which is the federal-sector provision. The federal-sector provision establishes that "[a]ll personnel actions affecting employees or applicants for employment . . . shall be made free from any discrimination based on race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-16(a). As the statutory language makes plain, only discrete "personnel actions" are covered, and any complaint that does not contain sufficient allegations to establish the plausible existence of such an action must be dismissed under Rule 12(b)(6). *See, e.g.*, *Evans v. Napolitano*, 466 F. App'x 190, 190–91 (4th Cir. 2012) (per curiam); *Boykin v. Virginia*, 2015 WL 5020896, at *6 (E.D. Va. Aug. 20, 2015), *aff'd*, 641 F. App'x 221 (4th Cir. 2016).

Though Title VII's federal-sector provision does not define "personnel action," "[c]ourts have long read this requirement to apply to both private and federal employees and have determined that the provision requires an employer's actions to impact the 'compensation, terms, conditions, or privileges of employment.'" *Caleca v. Burns*, 2024 WL 4255052, at *5 (E.D. Va. Sept. 20, 2024) (Nachmanoff, J.) (quotation omitted). This was in part because courts have long read 42 U.S.C. § 2000e-2 (Title VII's private-sector provision) in *pari materia* with Title VII's federal-sector provision. As this Court noted in *Caleca*, the Supreme Court signaled a potential

6

change to the standard for federal-sector employees in at least discrimination claims in *Babb v. Wilkie*, 589 U.S. 399, 405 (2020). *See Caleca*, 2024 WL 4255052, at *5.

In its discussion, *Babb* noted that the Age Discrimination in Employment Act's federal-sector provision—like Title VII's federal-sector provision—authorizes liability for "personnel actions." 589 U.S. at 405. The *Babb* Court observed that although "the ADEA does not define this term, its meaning is easy to understand," and pointed to a statutory provision of the Civil Service Reform Act ("CSRA"), 5 U.S.C. § 2302(a)(2)(A), that provides a list of employment decisions constituting a "personnel action." 589 U.S. at 405. Under the well-established principle that "when Congress uses the same language in two statutes having similar purposes . . . it is appropriate to presume that Congress intended that text to have the same meaning in both statues," *Smith v. City of Jackson*, 544 U.S. 228, 233 (2005), the *Babb* Court's *dictum* applies to Congress's use of "personnel actions" in Title VII. Thus, it is only those employment decisions listed in 5 U.S.C. § 2302(a)(2)(A)(i)–(xi), as well as "any other *significant* change in duties, responsibilities, or working conditions," *id.* § 2302(a)(2)(xii) (emphasis added), that are actionable under Title VII's federal-sector provision. Accordingly, a plaintiff suing a federal employer under Title VII must allege a listed personnel action or plead facts sufficient to plausibly establish a *significant* change in duties, responsibilities, or working conditions. *See Abdelhamid v. Sec'y of Navy*, 525 F. Supp. 3d 671, 684–85 (E.D. Va. 2021) (Brinkema, J.).

The Supreme Court's recent decision in *Muldrow v. City of St. Louis*, 601 U.S. 346 (2024), does not supplant or alter the above analysis based on *Babb*. In fact, *Muldrow*'s reasoning, which focused on the precise language of Title VII's provision applicable to *non-federal* employment, 42 U.S.C. § 2000e-2(a), has only further sharpened the distinctions between Title VII's private-sector

provision and Title VII's separate federal-sector provision.[5] In *Muldrow*, the employee sued her non-federal employer claiming that her job transfer was the result of sex discrimination in violation of § 2000e-2(a). 601 U.S. at 350. The employee contended that her transfer altered the terms or conditions of her employment, but the courts below rejected the argument, with the appellate court affirming judgment in the employer's favor because the alterations to the terms or conditions of her employment were not "significant." *Id. Muldrow* thus proceeded to "resolve a Circuit split over whether an employee challenging a transfer under Title VII must meet a heightened threshold of harm—be it dubbed significant, serious, or something similar." *Id.* at 353. Interpreting § 2000e-2(a), which establishes that it is unlawful for a (non-federal) employer to "discriminate against any individual with respect to his compensation, terms, conditions or privileges of employment because of such individual's race, color, religion, sex, or national origin," *Muldrow* held that an employee need only "show some harm respecting an identifiable term or condition of employment." *Id.* at 354–55. The Supreme Court squarely rejected any imposition of a requirement that the challenged change in terms or conditions of employment be "significant." *See id.* at 355 ("There is nothing in the provision to distinguish, as the courts below did, between transfers causing significant disadvantages and transfers causing not-so-significant ones.").

By contrast, claims against the federal government, like Plaintiff's claim here, proceed under a different statutory provision, as the federal government has only waived sovereign

---

[5] Referring to 42 U.S.C. § 2000e-2(a) as Title VII's "private-sector provision" is technically inexact. As *Muldrow* itself shows, that provision also covers employers such as city governments, which are non-private entities. Nomenclature aside, the salient point is that the protections of Title VII reach the federal government only by and through 42 U.S.C. § 2000e-16(a), *not* 42 U.S.C. § 2000e-2(a), which applies only to non-federal employers. *King v. Dalton*, 895 F. Supp. 831, 836 (E.D. Va. 1995) (Ellis, J.). Thus, the underlying statutory provision at issue in a Title VII claim matters when a federal government agency (here, TSA) is named as a defendant. *See Bonds v. Leavitt*, 629 F.3d 369, 384 (4th Cir. 2011) (noting different text and history of the Title VII provisions applicable to federal and non-federal employers).

immunity for Title VII claims under 42 U.S.C. § 2000e-16(a). *See supra* n.5. The separate and distinct federal-sector provision, 42 U.S.C. § 2000e-16(a), covers only "personnel actions," which are defined in the CSRA as a specific set of employment decisions, 5 U.S.C. § 2302(a)(2)(A)(i)–(xi), or "any other *significant* change in duties, responsibilities, or working conditions," *id.* § 2302(a)(2)(A)(xii) (emphasis added). *See Chatman v. Hegseth*, 2025 WL 2432722, at *6 n.8 (E.D. Va. Aug. 22, 2025) (Brinkema, J.) (observing the textual difference and noting that "the 'significant' threshold that the Supreme Court rejected for [non-federal] employment actions [in *Muldrow*] would still apply to [federal] personnel actions under the CSRA's catch-all provision"). The difference in wording between these two provisions is meaningful. The statutory language the Court interpreted in *Muldrow*, 42 U.S.C. § 2000e-2(a), does *not* mention "personnel actions" and is different on its face from the language in 42 U.S.C. § 2000e-16(a) that governs this case. As the Fourth Circuit recently observed, "there are some circumstances in which differences in statutory text may dictate different interpretations." *Herkert v. Bisignano*, 151 F.4th 157, 165–65 (4th Cir. 2025) (quotation omitted) (discussing reliance on Title VII precedent in Rehabilitation Act cases and finding such reliance appropriate in the absence of material textual differences).[6] This is one of those circumstances, as there is a clear, material difference between the language of Title VII's

---

[6] For additional context, *Herkert* properly applied the *Muldrow* adverse action standard to the federal employee's disability discrimination claim brought under the Rehabilitation Act. The Rehabilitation Act, 29 U.S.C. § 791(f), authorizes a cause of action for federal employees (and applicants) for disability-based discrimination and employs the standards for liability in 42 U.S.C. § 12112. *See also Doe v. U. of Md. Med. Sys. Corp.*, 50 F.3d 1261, 1265 n.9 (4th Cir. 1995) (explaining that the Rehabilitation Act and Americans with Disabilities Act employ language that "is substantially the same," and thus Court applies "the same analysis to both"). That provision, 42 U.S.C. § 12112, employs similar language as Title VII's private sector provision. *Compare* 42 U.S.C. § 12112, *with* 42 U.S.C. 2000e-2(a). The resulting effect is that Title VII's private-sector jurisprudence, given the statutory parallels, applies to Rehabilitation Act claims. And while there might be parallels between the Rehabilitation Act and Title VII's private-sector provision, they are not present in Title VII's federal-sector provision. Those textual differences matter.

provision applicable to private-sector employment and the language of its separate federal-sector provision.

All told, given these textual differences, and the Supreme Court's and the Fourth Circuit's renewed emphasis for courts to focus on the particular language that serves as the foundation for an employee's claims under the federal discrimination statutes, the governing standard for federal-sector Title VII discrimination claim is an adverse "personnel action" as defined by 5 U.S.C. § 2302(a)(2)(A). Indeed, "in this district, a personnel action must constitute 'a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Harris v. Wormuth*, 2023WL 6149071, at *4 (E.D. Va. Sept. 20, 2023) (Brinkema, J.) (quoting *Barnhill v Garland*, 636 F. Supp. 3d 592, 604 (E.D. Va. 2022)).[7]

**B.      Plaintiff Fails to Allege a Significant Change in Duties, Responsibilities, or Working Conditions as a Result of Not Being Able to Perform Pat Downs.**

1.       Plaintiff has failed to state a claim because there are no non-conclusory allegations plausibly establishing that the inability to perform pat-downs worked a significant change in responsibilities and working conditions. To start, the implementation of the pat-down policy does not constitute any of the personnel actions listed in 5 U.S.C. § 2302(a)(2)(i)-(xi). Thus, the success of Plaintiff's claims turns on the allegations plausibly meeting the CSRA's catch-all provision in 5 U.S.C. § 2302(a)(2)(xii).

a.       As a threshold matter, the policy documents Plaintiff incorporated by reference in the amended complaint state on their face that exempting transgender employees from conducting

---

[7] Even if the Court decides that *Muldrow* applies here and Plaintiff is thus required to show only an adverse employment action under the standard set forth in Title VII's provision covering non-federal employment, 42 U.S.C. § 2000e-2(a), the allegations in the amended complaint are still insufficient to state a claim, as explained below in Part B.2.

pat-downs does *not* hamper their career development within the TSA. Notwithstanding the new pat-down policy, "[t]ransgender officers will not be adversely affected in their ability to be selected for supervisory positions or receive recognitions bonuses, performance awards, promotions or other increases in salary, benefits, or responsibilities." Ex. 1 at 3. Plaintiff's own allegations bear this out. As Plaintiff alleges, the TSA "converted her to non-probationary status, recognizing her continued performance in alignment with TSA's *legitimate expectations*." Am. Compl. ¶ 107 (emphasis added). Thus, even though Plaintiff did not perform any pat-downs from February 2025 through July 2025, Plaintiff nevertheless met TSA's expectations, which Plaintiff admits were "legitimate." *Id.* Accordingly, the lack of performing pat-downs has not hampered Plaintiff's career prospects within the TSA thus far. Tellingly, there are no *factual* allegations in the amended complaint that Plaintiff has suffered any setback or limitation whatsoever in career development to date. On the contrary, the TSA elevated Plaintiff's employment status and, as a result, Plaintiff now has additional rights as a non-probationary employee. *See, e.g.*, *Cheatham v. Mayorkas*, 2022 WL 3367815, at *7 (W.D. Okla. Aug. 15, 2022) (noting that TSA screeners are subject to termination during the trial period without appeal or grievance rights).

To be sure, the amended complaint asserts that Plaintiff's *future* career advancement will be harmed. Am. Compl. ¶¶ 82–97. But that is speculation of Plaintiff's making—especially when there are no facts in the amended complaint that Plaintiff was denied a promotional opportunity (or even knows of that occurring to a similarly-situated TSO), and the policy directly contradicts Plaintiff's allegations. *See Thompson v. Potomac Elec. Power Co.*, 312 F.3d 645, 651 (4th Cir. 2002) (holding that it was "sheer speculation" for employee to assert that being denied certain training opportunities hurt performance and therefore limited promotion opportunities); *Chaplin v. Du Pont Advance Fiber Sys.*, 293 F. Supp. 2d 622, 627 (E.D. Va. 2003) (holding employee pled

speculative allegations about potential harms if employee violated employer's policy as no actual harms were alleged); *Floyd v. U.S. Dep't of Homeland Sec.*, 2009 WL 3614830, at *7 (D. Md. Oct. 27, 2009) (holding plaintiff failed to allege an adverse action when she "merely alleged that she believes that her future ability to be promoted has been circumscribed"). Moreover, as discussed above, the specific factual allegations of the amended complaint—that Plaintiff received a performance-based improvement in employment status by completing the probationary period and transitioning to a non-probationary position—only further undercut this speculation.

b.      Next, Plaintiff's allegations do not plausibly establish that the pat-down policy results in a significant change to job responsibilities. As Plaintiff alleges, a TSO rotates through six roles during a typical shift. Am. Compl. ¶ 19. Of these, only two are affected by the challenged pat-down policy; nothing prevents Plaintiff from performing the full complement of responsibilities in the roles of Travel Document Checker, Divesting Officer, X-Ray Operator, and Property Search Officer. *See id.* ¶¶ 19–21. Per the amended complaint, the pat-down policy only reaches Plaintiff's work as a Passenger Screening Officer and a Floor Officer. *See id.* ¶¶ 20–21. Thus, for the majority of Plaintiff's work as a TSO, the pat-down policy has no effect.

Though the pat-down policy exempts Plaintiff from performing pat-downs, there is nothing to suggest that the policy has prevented Plaintiff from continuing to rotate through the Passenger Screening Officer and Floor Officer roles. Nor could it: As even Plaintiff admits, performing pat-downs is but one component of the work in those roles. *Id.* When serving as a Passenger Screening Officer, TSOs principally operate the screening equipment (*e.g.*, metal detector, body scanners), and pat-downs are only needed "[u]nder certain circumstances." *Id.* ¶ 20. And there is nothing in the allegations to suggest the *sole* role of the Floor Officer is to conduct pat downs. *Id.* ¶ 21. All told, the allegations do not establish that the pat-down policy has caused any *significant* change to

Plaintiff's responsibilities or the material terms of Plaintiff's employment. Rather, it has refined Plaintiff's work portfolio to instead emphasize other work Plaintiff is required to perform as a TSO. *See White v. Soc. Sec. Admin.*, 1997 WL 619298 (M.S.P.B. Sept. 19, 1997) ("removal of those cases would only have resulted in the petitioner's ultimately being assigned other similar cases"), *aff'd*, 152 F.3d 948 (Fed. Cir. 1998).

c.    Plaintiff further speculates that the pat-down policy also "prohibit[s] her from obtaining shifts through a shift trade or picking up extra shifts from her TSO colleagues." Am. Compl. ¶ 112. But once again, Plaintiff's speculation is wholly unsubstantiated by any factual content pled in the amended complaint. Although the TSA's applicable policy states that "[e]mployees on limited duty or light duty may only make one-way shift trades off and only with employees with no restrictions," Ex. 7, App. C, § D(2)(i), nothing in that policy, or in the TSA's pat-down policy, suggests that Plaintiff actually has been placed on, or is considered to be on, limited or light duty status as a result. *See generally* Ex. 1; Ex. 7.

Moreover, the amended complaint does not allege that Plaintiff has ever attempted to make a shift trade or pick up an additional shift and been denied due to the pat-down policy. Nor does it allege that Plaintiff is aware that any similarly situated TSO has been denied a shift trade or pick-up for that reason. The assertion that TSA *de facto* considers Plaintiff to be on limited duty by virtue of the new policies simply cannot be squared with those policies' text, and there are no *facts* alleged in the amended complaint to support the bare conclusion that, notwithstanding the policies' plain language, Plaintiff in fact is on a limited duty status. Plaintiff's speculation must therefore yield to the plain letter of the TSA policy documents that were incorporated by reference into the complaint. *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 167 (4th Cir. 2016) ("When the plaintiff attaches or incorporates a document upon which his claim is based, or when the complaint

13

otherwise shows that the plaintiff has adopted the contents of the document, crediting the document over conflicting allegations in the complaint is proper."). Accordingly, Plaintiff has not plausibly pled that there has been *any* change to her ability to trade or pick up shifts, let alone a *significant* change qualifying as a personnel action.

In sum, Plaintiff has not pled an actionable personnel action in connection with TSA's implementation of the pat-down policy.

2.    Even if the Court applied *Muldrow*'s adverse-action standard, Plaintiff still has not pled a plausible claim. For Plaintiff to succeed on this standard, the amended complaint must set forth sufficient factual allegations to show that Plaintiff incurred a "disadvantageous change in an employment term or condition." *Herkert*, 151 F.4th at 163. As discussed above, *supra* Part B.1, the elimination of pat-downs from Plaintiff's work as a TSO is not an adverse change. TSA policies, as well as Plaintiff's completion of the probationary period, confirm that Plaintiff's career growth is not limited due to not performing pat-downs. Nor does being exempt from performing pat-downs affect an employee's ability to trade shifts on the same basis as other employees.

Though the policy alters a TSO's work portfolio when performing the Passenger Screening Officer and Floor Officer roles, this policy does not work to Plaintiff's detriment in any way. Plaintiff still performs all other aspects of the roles and has met "TSA's legitimate expectations" even without performing pat-downs. Am. Compl. ¶ 107. In effect, though this policy allegedly causes more work for *others*, *id.* ¶¶ 78–79, it does not adversely affect the terms and conditions of *Plaintiff's* employment. This "refinement of plaintiff's duties or the assignment of new ones" cannot constitute an adverse action under Title VII. *Carter v. Bridenstine*, 2020 WL 1536250, at *12 (D.D.C. Mar. 31, 2020), *aff'd sub nom. Carter v. Nelson*, 2021 WL 6139250 (D.C. Cir. Dec.

14

27, 2021). In sum, even under the adverse-action standard, Plaintiff has not stated a claim for relief in connection with TSA's pat-down policy.

Though Plaintiff alleges that the pat-down exemption policy changed the work environment, Am. Compl. ¶¶ 77-78, 80, those allegations do not bolster support the plausibility of the *discrete act* claim. *Buck v. Modine Mfg. Co.*, 776 F. Supp. 3d 357, 370 (W.D. Va. 2025) ("Buck is still required to connect the discriminatory harm to an identifiable term or condition of employment." (citation omitted)). That is especially pertinent here when Plaintiff has not brought a hostile work environment claim. As *Buck* illustrates, linking the discriminatory act to a term or condition of employment is a core pleading requirement. *See id.* Otherwise, "causes of action for disparate treatment discrimination and hostile work environment would merge." *Id.* Preserving that distinction between these two types of discrimination claims is key, as the Supreme Court made clear that "[h]ostile work environment claims are different in kind from discrete acts." *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115 (2002). Thus, Plaintiff must link the policy, through non-conclusory factual allegations, to an adverse change in the terms and conditions of employment as a TSO. For the reasons discussed above, Plaintiff has not met this pleading burden.

## CONCLUSION

Plaintiff's Title VII claim fails for the straightforward reason that the amended complaint does not plausibly allege an actionable personnel action (or, alternatively, an adverse employment action). Because Plaintiff fails to state an essential element of the claim, the Court should grant Defendant's motion and dismiss this action.

//

//

Dated: February 23, 2026

Respectfully submitted,

TODD W. BLANCHE
DEPUTY ATTORNEY GENERAL

By: _____/s/_____
MATTHEW J. MEZGER
PETER B. BAUMHART
Assistant United States Attorneys
Office of the United States Attorney
Justin W. Williams U.S. Attorney's Building
2100 Jamieson Ave.
Alexandria, VA 22314
Tel:    (703) 299-3741/3738
Fax:    (703) 299-3983
Email:  Matthew.Mezger@usdoj.gov
        Peter.Baumhart@usdoj.gov

*Counsel for Defendant*

16